# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2004-AN-01641-SCT

*IN THE MATTER OF THE ENLARGING,
EXTENDING, AND DEFINING THE
CORPORATION LIMITS OF THE CITY OF
BROOKHAVEN, LINCOLN COUNTY,
MISSISSIPPI*

## ON MOTION FOR REHEARING

| | |
|---|---|
| DATE OF JUDGMENT: | 08/03/2004 |
| TRIAL JUDGE: | HON. JOHN C. ROSS, JR. |
| COURT FROM WHICH APPEALED: | LINCOLN COUNTY CHANCERY COURT |
| ATTORNEY FOR APPELLANT: | T. JACKSON LYONS |
| ATTORNEYS FOR APPELLEE: | JERRY L. MILLS |
| | JOSEPH A. FERNALD, JR. |
| NATURE OF THE CASE: | CIVIL - MUNICIPAL BOUNDARIES & ANNEXATION |
| DISPOSITION: | AFFIRMED - 06/14/2007 |
| MOTION FOR REHEARING FILED: | 05/03/2007 |
| MANDATE ISSUED: | |

**EN BANC.**

**DIAZ, PRESIDING JUSTICE, FOR THE COURT:**

¶1.     The motion for rehearing is denied.  The original opinion is withdrawn and this opinion is substituted therefor.

¶2.     This is a case about annexation. The city of Brookhaven is the heart of Lincoln County, and is the uncontested economic engine of its people and property.  Now, long past

the point at which cities often expand, Brookhaven seeks to absorb the land of its neighbors into its boundaries.

¶3.     The objectors, the Citizens Against Annexation (CAA), appeal the determination by the Lincoln County Chancery Court that the annexation is reasonable.

## Standard of Review

¶4.     Our standard of review for annexation is very limited.  We will reverse a chancery court's findings as to the reasonableness of an annexation only if the chancellor's decision is manifestly wrong and is not supported by substantial and credible evidence.  *City of D'Iberville v. City of Biloxi*, 867 So. 2d 241, 248 (Miss. 2004).  Where there is conflicting yet credible evidence, we will defer to the findings of the trial court.  *Id.*  We reverse only where the Chancery Court has employed erroneous legal standards or where we are left with a firm and definite conviction that a mistake has been made.  *Id.*

## Analysis

¶5.     Annexation cases often cause the courts and the litigants a great deal of heartburn. The glory of equity does not rest on bright-line tests but rather on a Solomon-like dedication to fairness.  The issues of annexation—taxation, population, minority voting strength, utility service—are creatures of math and cash, not equity.  We must struggle to quantify and qualify our goal of equity when it is applied to the complex balance between urban, suburban, and rural.

¶6.     "The role of the judiciary in annexations is limited to one question: whether the annexation is reasonable." *Mun. Boundaries v. City of Madison*, 650 So. 2d 490, 494 (Miss.

2

1995).  To guide us in ascertaining reasonableness, we have developed eleven concepts, some of which overlap in substance.  These indicia of reasonableness need not be met factor by factor, but must be viewed through the lens of totality.  *Id.* at 494.  We have underscored this often, to the point where we have crafted a catch-all twelfth factor embracing "any other factors" that might illustrate fairness.  *Id.*

¶7.     The twelve indicia of reasonableness are: (1) the municipality's need to expand, (2) whether the area sought to be annexed is reasonably within a path of growth of the city, (3) potential health hazards from sewage and waste disposal in the annexed areas, (4) the municipality's financial ability to make the improvements and furnish municipal services promised, (5) the need for zoning and overall planning in the area, (6) the need for municipal services in the area sought to be annexed, (7) whether natural barriers exist between the city and the proposed annexation area, (8) past performance and time element involved in the city's provision of services to its present residents, (9) economic or other impact of the annexation upon those who live in or own property in the proposed annexation area, (10) impact of the annexation upon the voting strength of protected minority groups, (11) whether the property owners and other inhabitants of the areas sought to be annexed have in the past, and will in the foreseeable future unless annexed (because of their reasonable proximity to the corporate limits of the municipality) enjoy economic and social benefits of the municipality without paying their fair share of taxes, and (12) any other factors that may suggest reasonableness.  *Id.*

3

¶8.     The CAA asks us to review two issues in this case. First, in its words, did "the chancellor err in finding that the rural areas of the proposed annexation area are developing into urban areas, or will urbanize within the near future?" As noted above, we will confine our analysis to whether the annexation is reasonable.

¶9.     Second, CAA proposes that we "adopt a new guideline requiring cities to quantify the degree of purported urbanization within a territory proposed to be annexed when, as here, a large area of vacant, timber, and agricultural land is included within the area desired to be annexed." We will address the concerns of the CAA in turn.

### I. Is the annexation reasonable?

¶10.    Of the twelve indicia, the CAA concedes outright the presence of five. They concede the presence of potential health hazards from sewage and waste disposal in the annexed areas, as Lincoln County provides no sewer support, the soil type is largely unsuited to onsite septic systems, and open sewage has been witnessed throughout the proposed annexation area, including near a local private school.

¶11.    The CAA also concedes that the City has the financial ability to make needed improvements and to furnish municipal services in the proposed annexation area. Despite this concession, it is important to note the extent to which Brookhaven already has extended services into the proposed annexation area, or the "PAA." The chancery court found that the City has managed its financial affairs well, funding all governmental services while also expanding improvements such as road paving and extending water and sewer lines. The trial court found that Brookhaven has the financial ability to offer full water and sewer

4

connections to all of the PAA within five years. Further, as will be examined in more detail later, the City has long provided fire and police protection to the PAA—despite the fact that it is outside city limits and the City receives no tax revenue for doing so.

¶12. CAA also acknowledges that no natural barriers exist between the city and the proposed annexation area. This is important only to further illustrate that the twelve indicia are merely methods of ascertaining reasonableness. As with the natural barrier indicator, some indicia do not apply at all, as in this case the PAA is directly contiguous with the City.

¶13. The past performance and time element involved in the City's provision of services to its present residents was also conceded. Lastly, the impact on minority voting strength was found to be *de minimis*, as 51.4% of the City before annexation is African-American and 1.1% is non-white. After annexation, those numbers will shift slightly to 50.2% African-American and 1.1% non-white, a -1.2% change.

### A. The municipality's need to expand.

¶14. The trial court found that Brookhaven needed to expand. While the CAA does not itself want to be annexed, it is strident in its belief that "Brookhaven unquestionably and rather belatedly needs to expand," and the group "agrees that the City also needs additional vacant land in which to expand." CAA wishes instead for the City to prove it needs "the quantity of developable land" contained within the PAA. In other words, the CAA treads the thin line between admitting the City needs to expand, and wanting it to justify how much new area it actually needs.

¶15. The City indeed bears the burden of proving the annexation is reasonable. *See* Miss.

5

Code Ann. § 21-1-33 (Rev. 2001) ("In any proceeding under this section the burden shall be upon the municipal authorities to show that the proposed enlargement or contraction is reasonable").

¶16.    The need of the City to expand is conceded by the CAA's brief, supported by an ample record, and was actually admitted by CAA's expert at trial.   The trial court found that Brookhaven was 79.4% "built-out," or developed.  Evidence was presented that Brookhaven was statistically one of the most densely populated cities of its size in Mississippi. The trial court agreed that the City is accepted as the "economic engine of Lincoln County" due to its ample resources for shopping, medical care, financial services, and other services.   This indicium weighs in favor of annexation.

### B.  Whether the area sought to be annexed is reasonably within a path of growth of the city.

¶17.    When considering the indicium of reasonableness for the path of growth, a city need only show that the areas desired to be annexed are in a particular path of growth; the area does not have to be located in the most urgent area of growth or even in the city's primary path of growth. *In re Extension of the Boundaries of Winona v. City of Winona*, 879 So. 2d 966, 977 (Miss. 2004).  We have also crafted a number of factors which are non-exclusive to aid in our consideration of this indicium.  These factors include (1) if there is spillover development in the annexation area; (2) if the annexation area is immediately adjacent to City; (3) if there is a limited area available for expansion; (4) whether there is interconnection by transportation corridors; (5) whether there is increased urban development in annexation

6

area; (6) geography; and (7) subdivision development. *Id.* at 977.

¶18.     The trial court found that spillover existed in the PAA and that the PAA is directly adjacent to and contiguous with the City. The area is connected by Highway 84 and First and Second Streets, along with other county roads and a rail line. Development exists in the PAA that is urban in nature and virtually indistinguishable from that of Brookhaven. The trial court determined that "[t]he conclusion was inescapable" that the PAA is in the path of growth.

¶19.     The PAA is home to a vast number of projects, some of which are actually City-funded and owned. These include the Brookhaven Industrial Park, Brookhaven Country Club, Brookhaven Wastewater Treatment Facility, Brookhaven City Sports Complex, a livestock facility, a private school, the Brookhaven Fire Station, a Baptist church, a headquarters for the Highway Patrol, an Mississippi Department of Transportation office, a juvenile rehabilitation facility, and a National Guard Armory.

¶20.     Indeed, the CAA concedes that "[t]he proof could not be clearer that the Union Street extension to the interstate interchange," one part of the PAA, "is a typical path of growth." The main thrust of its argument is that portions of the PAA are not in the path of growth. It argues that "[t]he City's primary path of growth is to the north and east," and that "[a]side from the development at the edges of the City, [which is] admittedly spillover growth, the predominantly rural parts of the PAA are not within the City's path of growth."

¶21.     This statement ignores our test: The area does not have to be located in the *most* urgent area of growth or even in the city's *primary* path of growth, but simply in *a* path of

7

growth. The City has spilled over into the PAA and is continuing to expand into the county. There are multiple paths of growth, some more urgent than others, but it is reasonable to find that all of the adjacent areas of the City, which the PAA comprises, are in a path of growth. This indicium favors the City.

### C. The need for zoning and overall planning in the area.

¶22. The trial court found that the City had zoning ordinances, subdivision regulations, a building code, a burning ordinance, and a flood plain ordinance. The PAA has none of these. The City also has a full-time building inspector. Because the area is developing, and the county offers no regulation, the trial court found a need in the PAA for zoning and planning.

¶23. The City notes thirteen separate planning and zoning instances in Brookhaven, with none in the county. Because the PAA is already heavily urbanized, the City argues that the lack of land-use planning has resulted in "leap-frog development" and that enemy of economy and utility, urban sprawl. In the case of *In re Enlargement and Extension v. City of Jackson* we quoted with approval an expert who stated that "[m]ost cities try to eliminate sprawl," as "[u]rban sprawl is an extremely expensive manner for a city to service the area." 691 So. 2d 978, 982 (Miss. 1997).

¶24. In contrast, the CAA argues that annexation will deprive the residents of the PAA of the full use of their land. The CAA again admits Brookhaven should annex, but not in its direction. It argues that the proposed annexation will result in residents being forbidden to hunt with rifles on their land, having to leash their pets, and being unable to engage in agricultural burning as needed. The CAA basically argues that zoning has very little to offer

8

it.

¶25. Yet the evidence demonstrated, and the trial court found, that development in the PAA was already proceeding at a strong clip, and that this unregulated development was putting a strain on utilities and other municipal services. The evidence showed that zoning and other planning could maximize the economic use of land in the City and the PAA, thus benefiting all involved. Accordingly, this indicator runs in favor of Brookhaven.

**D. The need for municipal services in the area sought to be annexed.**

¶26. We have previously considered seven non-exclusive factors to determine if this indicator of reasonableness was met: (1) requests for water and sewage services; (2) plan of the City to provide first-response fire protection; (3) adequacy of existing fire protection; (4) plan of the City to provide police protection; (5) plan of the City to provide increased solid waste collection; (6) use of septic tanks in the proposed annexation area; and (7) population density. *Winona*, 879 So. 2d at 984.

¶27. The trial court determined that the PAA desperately needed sewer access, as has been mentioned above, noting that the City has already extended water and sewer access to portions of the PAA. It is undisputed that Brookhaven has thirty-two police officers who serve the City; in contrast, Lincoln County has only twenty officers in the Sheriff's department to serve 585 square miles. Evidence demonstrated that the City already provides police services in the PAA and could expand rapidly to provide more.

¶28. The City also has a paid, full-time fire department, which has long responded to calls from within the PAA, actually maintaining a fire station within the PAA. The Brookhaven

9

Fire Department responded to 108 calls from within the PAA over a five-year period, and the City offered that annexation would allow it to expand these services. The trial court found that this indicator ran in favor of the City.

¶29. The CAA concedes that these services have long been offered and accepted by those in the PAA, but offers that "[t]he City was unable to muster a single person who requested services," ignoring the 108 documented fire calls from the PAA. This argument simply strains credibility.

¶30. The PAA clearly needs City services, and Brookhaven is in the position to provide them. This is different from the case of *Jackson*, in which we stated that "[b]efore the City of Jackson annexes more land and residents for which it has had to extend infrastructure and provide services, it should make an effort to extend that infrastructure to the vacant, developable land within the existing boundaries and take steps to encourage development in those areas." *Jackson*, 691 So. 2d at 983. The opposite situation exists here; Brookhaven has already extended municipal services well beyond its boundaries without recompense. We do not pass judgment on whether this was economically advisable on behalf of the City, but note that the CAA simply does not want to pay for the services which it already receives free. This indicium runs in favor of Brookhaven.

### E. The economic or other impact of the annexation upon those who live in or own property in the proposed annexation area.

¶31. This indicator of reasonableness is often about one thing: taxes. Living within a municipality may sometimes cause a citizen to pay taxes not otherwise incurred, and we seek

10

to reasonably balance that demand within the larger context of goods and services received. We have said before "that municipalities must demonstrate through plans and otherwise, that residents of annexed areas will receive something of value in return for their tax dollars in order to carry the burden of showing reasonableness." ***In re the Extension of the Boundaries of the City of Columbus v. City of Columbus***, 644 So. 2d 1168, 1172 (Miss. 1994).

¶32.    In the case at hand, the trial court found that the increased taxes of those in the PAA would be amply offset by increased goods and services, as discussed *supra*.  In addition, testimony was introduced at trial that those in the PAA would soon received a better fire rating, which could result in greatly lowered fire insurance premiums.

¶33.    The CAA is candid when it notes that "[t]here will probably never be an annexation case where objectors do not bewail the additional taxes," and admits that "[t]his case will not disappoint."  It suggests that "the most tangible thing received [for annexation] will be increased taxes."  This argument is disingenuous and disregards the ample evidence showing that the PAA already receives a large volume of services without tendering taxes in return, including critical fire and police protection.  The ratification of that fire protection through annexation could actually cause insurance rates within the PAA to go down, thus saving the residents of the PAA money.  This indicator falls in favor of the City.

### F. Benefits of proximity to the city.

¶34.    The next indicium asks whether "property owners and other inhabitants of the areas sought to be annexed have in the past, and in the foreseeable future unless annexed will, because of their reasonable proximity to the corporate limits of the municipality, enjoy

11

economic and social benefits of the municipality without paying their fair share of taxes." ***Madison***, 650 So. 2d at 494 (Miss. 1995).

¶35.   This has been discussed *supra*, particularly in Section D, which examined the need for municipal services in the PAA.  This indicator of reasonableness is sometimes difficult to ascertain.  For instance, in ***Poole v. City of Pearl (In re Extension of the Boundaries)***, the determination of free rider "overlap" was daunting, as "[t]he PAA [was] surrounded on all sides by four separate municipalities," and so it was "difficult from the record before us to determine which of those benefits are due to the proximity with Pearl, as opposed to Brandon, Flowood, or Jackson." 908 So. 2d 728, 744 (Miss. 2005).  There is no such difficulty here.  The evidence is uncontroverted that Brookhaven provided more than a dozen services to the PAA which were not performed by the surrounding county, and it has long provided direct services to portions of the PAA.

¶36.   Of the twelve indicators we look to in ascertaining reasonableness, the CAA began by conceding five.  Of the others, many are moot:  Brookhaven, for all intents and purposes, has long been providing many services to portions of the PAA.  Viewed through the lens of totality, Brookhaven's annexation of the PAA is entirely reasonable.

¶37.   As to the twelfth indicator, "other factors," the CAA suggests a new angle which will be examined below.

**II.  Should another factor be added?**

¶38.   The CAA argues that we should "adopt a new guideline requiring cities to quantify the degree of purported urbanization within a territory proposed to be annexed when, as here,

12

a large area of vacant, timber, and agricultural land is included within the area desired to be annexed." In support of this argument, it points to a North Carolina statute which provides details on when annexation is appropriate.

¶39. We decline this invitation. As we have noted repeatedly, annexation is an exercise of legislative power, not judicial power. *Poole*, 908 So. 2d at 730. As we pointed out at length in *Poole*, dozens of bills and constitutional amendments have been proposed in the Legislature to codify or formalize annexation. *Id.* at 731. In *Poole*, a party sought to establish the requirement of a vote to approve annexation, the idea of which we rejected out of hand. *Id.* at 730.

¶40. While the Legislature of North Carolina saw fit to adopt specific annexation guidelines, we will remain committed in our attempt to ascertain if the annexation is reasonable. *See* Miss. Code Ann. § 21-1-33 (Rev. 2001).

**Conclusion**

¶41. Our paramount concern in annexation cases continues to be whether the annexation is reasonable. Until such time as the Legislature sees fit to codify or formalize another process, we will decline to create any other requirements for annexation. In this case, the City of Brookhaven demonstrated that its desired annexation of neighboring land was reasonable. Accordingly, the order Lincoln County Chancery Court approving annexation is affirmed.

¶42. **AFFIRMED.**

**SMITH, C.J., WALLER, P.J., CARLSON, GRAVES AND DICKINSON, JJ.,**

13

CONCUR. RANDOLPH, J., CONCURS IN RESULT ONLY. EASLEY, J., DISSENTS WITHOUT SEPARATE WRITTEN OPINION. LAMAR, J., NOT PARTICIPATING.